1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   REBECCA WAHLMAN, et al.,              CASE NO. C12-1997JLR

11                    Plaintiffs,          ORDER ON MOTIONS FOR
                                           SUMMARY JUDGMENT
12          v.

13   DATASPHERE TECHNOLOGIES,
     INC.,
14
                     Defendant.
15

## I.   INTRODUCTION

16

17          Before the court are Defendant DataSphere Technologies Inc.'s ("DataSphere")

separate motions for summary judgment against Plaintiff Rebecca Pinto[1] (Pinto Mot.
18

19

20          _____

21          [1] Formerly Rebecca Wahlman, as reflected in the case caption.  (*See* Resp. (Dkt. # 53)
     at 2.)
22

ORDER- 1

1  (Dkt. # 39)), and Plaintiff Shari Graber (Graber Mot. (Dkt. # 37)).[2]  The court has heard

2  oral argument and considered the motions, all submissions filed in support and opposition

3  thereto, the balance of the record, and the applicable law.  Being fully advised, the court

4  GRANTS in part and DENIES in part both motions as discussed below.

5  ## II.    BACKGROUND

6      This is an employment discrimination case.  Ms. Pinto and Ms. Graber contend

7  that they were "exposed to shocking working conditions, including repeated verbal abuse

8  from supervisory employees using sexist slurs, . . . [and] sexist and racist e-mail

9  messages that were condoned and encouraged by management" while employed at

10  DataSphere.  (Compl. ¶ 12.)  Plaintiffs bring federal and state law claims alleging that

11  DataSphere created a hostile work environment and discriminated against them on the

12  basis of their sex.  (Compl. (Dkt. # 1) ¶ 1.)

13      The dispute arises from Plaintiffs' employment as sales account executives at

14  DataSphere.  DataSphere is an "[i]nternet-based media advertising company

15  headquartered in Bellevue, Washington."  (O'Neil Decl. (Dkt. ## 38, 40) ¶ 3.)  Ms.

16  _____

17      [2] The court notes that DataSphere filed separate motions for summary judgment against

18  each Plaintiff in contravention of Local Rule 7(e)(3), which prohibits contemporaneous
   dispositive motions.  *See* Local Rules W.D. Wash. LCR 7(e)(3).  DataSphere's motions are
   contemporaneous dispositive motions and DataSphere should have not filed them together.  This

19  is sanctionable conduct.  The court also notes that DataSphere's motions may be overlegnth as
   they contain significant footnoting of DataSphere's arguments and other relevant material.  *See*

20  Local Rules W.D. Wash. LCR 7(e)(3), (4), (6); *Glassybaby, LLC v. Provide Gifts, Inc.*, No. 11-
   0380MJP, 2011 WL 4571876, at *4 (W.D. Wash. Sept. 20, 2011) ("As a warning to all parties,

21  the court strongly urges parties to avoid footnotes, particularly for any substantive purpose.  The
   Court is not in the practice of reading lengthy footnotes where they are used merely as a way to

22  avoid page limitations.").  Nevertheless, the court has decided to consider the merits of
   DataSphere's motions in the interest of streamlining the upcoming trial.

1    Graber was hired as an account executive by DataSphere in May 2011, and Ms. Pinto

2    was hired as an account executive in September 2011.  (Compl. ¶¶ 5-6.)  As account

3    executives, Plaintiffs sold advertising space on local news websites.  (*See* Graber Dep.

4    (Dkt. ## 42-3, 58) at 94; Pinto Dep. (Dkt. ## 42-1, 42-2, 61, 62, 63) at 37.)  DataSphere's

5    account executives are organized into teams, each with a unique name.  (O'Neil Decl.

6    ¶ 3.)  Plaintiffs were both members of "The Force."  (*Id.* ¶ 7.)

7         Plaintiffs testify that they were sent sexist and sexually explicit e-mail messages

8    during their employment at DataSphere.  (Pinto Dep. at 115; Graber Dep. at 117.)  These

9    e-mail messages include one in which a manager celebrates a recent sale by saying "[t]he

10   sales are coming in so fast its creepy! Just like this picture."  (Resp. (Dkt. # 53) at 6; *see*

11   Carlson Decl. Ex. D (Dkt. # 56) at 1.)  The accompanying picture depicts a grown man

12   with his pants unzipped facing a little boy; another man's bald head protrudes from the

13   grown man's unzipped pants and seems to be yelling at the little boy.  (*See id.*)  The bald

14   man appears to symbolize a man's penis and the scene portrays a pedophilic theme.

15   Other e-mails were sent by Plaintiffs' "Sales Manager" Reed Mattson.[3]  (Resp. at 6.)  In

16   one e-mail Mr. Mattson offers to buy lunch for his sales team if they get five sales, and

17   includes a picture of a naked woman covered in sushi.  (Carlson Decl. Ex. D at 9.)  Mr.

18   Mattson also sent another e-mail to encourage sales that reads "Get them screamin' 'Yes'

19   like **Sally** does . . . What's in it for you besides the thrill?  $200 of course!" and includes

20   a picture of a scene from the film "When Harry met Sally."  (*Id.* at 16 (emphasis in

21   ────────────────

22        [3] Mr. Mattson was Plaintiffs' supervisor.  (O'Neil Decl. ¶ 7.)

1  original).)  In the scene and picture, the main female character vocally simulates an

2  orgasm loudly in the middle of a restaurant.  (*See id.*)[4]  Finally, other e-mails feature rape

3  jokes including one with the text:  "[h]e's climbing in your windows[,] He's snatchin

4  your people up[,] So Hide your kids, hide your wife[,] Cause Luke rapin errbody out

5  there!!!!"[5]  (*Id.* at 2.)  Plaintiffs testify that they found these and other e-mails with sexist

6  themes "offensive" and "inappropriate."  (Graber Dep. at 117; Pinto Dep. at 107, 111.)

7  Additionally, Ms. Pinto testifies that her "Team Captain" on The Force, Antonio

8  Jones,[6] once shot her in the breast with a "Nerf" gun.  She states that Mr. Jones walked

9  up to her, pointed the Nerf gun at her, and shot her in the breast.  (Pinto Dep, at 75.)  Ms.

10  Pinto felt "mortified and humiliated" because of this incident.  (*Id.*)  With regard to Nerf

11  guns, DataSphere's human resources report states, "Nerf guns are part of DataSphere's

12  casual and fun work environment; employees play with these toys during work hours,

13  including shooting each other in jest."  (O'Neil Decl. (Dkt. ## 38-4, 40-4) Ex. H at 10.)

14

15

16  [4] This e-mail was sent on June 28, 2011, before Ms. Pinto was employed at DataSphere. (*See* Carlson Decl. Ex. D. at 16.)  However, Ms. Graber was employed at DataSphere during this

17  time and received this e-mail.  (*Id.*)

18  [5] This is a reference to the popular YouTube video "Bed Intruder Song," which has been viewed over 119,000,000 times.  *See* Auto-Tune the News, "BED INTRUDER SONG!!!" *YouTube* (Jul. 31, 2010),

19  http://www.youtube.com/watch?v=hMtZfW2z9dw&list=RDEzNhaLUT520.

20  [6] Mr. Jones' position as "Team Captain" was non-supervisory.  Instead, "[t]he Team Captain role [is] a non-management lead role that DataSphere uses as a training and proving

21  ground for potential new Sales Managers."  (O'Neil Decl. (Dkt. ## 38, 40) ¶ 8.)  "As Team Captain, Antonio Jones had no authority to hire, fire, discipline, or otherwise make any

22  substantive employment decisions concerning anyone . . . ."  (*Id.*)

1   Plaintiffs also testify that their Team Captain Mr. Jones and supervisor Mr.

2 Mattson consistently called them derogatory names like "bitch" and "cunt." (Resp. at 2-

3 3; Pinto Dep. at 46-47, 150, 152-53; Graber Dep. at 95-98, 100-02, 109-10, 117-19, 120.)

4 Plaintiffs' testimony is corroborated by Chuck Siegmund, another account executive on

5 The Force, who reported to DataSphere's "Sales Director" Josh Hartnett on September

6 30, 2011, that Mr. Jones "engage[ed] in obscene verbal outbursts on the sales floor."

7 (O'Neil Decl. (Dkt. ## 38, 40) ¶ 8.)  Mr. Jones' "verbal outburst" on September 30, 2011,

8 was directed at Ms. Pinto.  (Pinto Dep. at 49-50; *see also* Graber Dep. 104-06.)[7]  During

9 this outburst Mr. Jones punched the wall of Ms. Pinto's cubicle, told her that she was

10 "fucking worthless," and called her a "fucking bitch."  (Pinto Dep. at 50-51.)  After the

11 September 30 outburst, Mr. Hartnett discussed the incident with Mr. Jones but did not

12 discipline him.  (*See* O'Neil Decl. Ex. D at 16-17.)  After not being disciplined, Mr. Jones

13 announced to the team that he was "untouchable" and that he could do whatever he

14 wanted.  (Pinto Dep. at 50-51.)  Ms. Pinto was verbally threatened again by Mr. Jones on

15 October 11, 2011, after he found out she imitated him during a team meeting at Mr.

16 Mattson's request.  (Pinto Dep. at 87-91.)  During the October 11 confrontation, Mr.

17 Jones again called Ms. Pinto a "fucking bitch" and threatened that she would be kicked

18 off the sales team if she imitated him again.  (Pinto Dep. at 87.)  Following this incident,

19

20   [7] DataSphere disputes that the September 30, 2011, outburst by Mr. Jones was directed at

21 Ms. Pinto; DataSphere argues that this outburst was not aimed at anyone in particular.  (*See* Pinto Mot. at 5; *see also* O'Neil Decl. ¶¶ 10, 13; O'Neil Decl. Ex. D (Dkt. ## 38-4, 40-4) at 9.)

22 However, on summary judgment, the evidence of the opposing party—Ms. Pinto in this case—is to be believed.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1985).

1   Ms. Pinto complained to DataSphere's management about Mr. Jones' conduct and

2   ultimately resigned on November 7, 2011.  (Pinto Dep. at 91-94; O'Neil Decl. ¶ 16.)  Ms.

3   Graber also quit her job at DataSphere during this same timeframe—on October 20,

4   2011.  (O'Neil Decl. ¶ 14.)  Ms. Graber quit the day after Mr. Jones threatened her and

5   called her a "fucking bitch" among other expletives, following a meeting she had with

6   DataSphere's "Human Resources Director" Raymond Granaada about Mr. Jones'

7   conduct.  (Graber Decl. at 109.)  Both Plaintiffs contend that they were "constructively

8   discharged" and forced to resign.  (Compl. ¶¶ 19, 21, 25, 29, 33, 37, 41.)

9          After Mr. Siegmund's and Ms. Pinto's reports, DataSphere assigned Ms. Pinto to a

10  different sales team and investigated Mr. Jones' and Mr. Mattson's conduct.  (*See* O'Neil

11  Decl. Ex. H. at 6.)  In its report on the investigation, DataSphere concluded that Mr.

12  Jones should be given a "stern written warning" and that he should not be considered for

13  any managerial roles.  (*Id.* at 13-14.)  With regard to Mr. Mattson, the report concluded

14  that he should also be given a written warning, "indicating that he could have handled the

15  situation better."  (*Id.*)  DataSphere's report also concluded that it was unlikely that Mr.

16  Mattson did not know about Mr. Jones' ongoing inappropriate behavior.  (*Id.* at 8.)[8]  Both

17  _____

18  [8] With regard to Mr. Mattson, DataSphere's report states:

19  Based on the substantial evidence from multiple team members about [Mr.
    Jones'] loud and outlandish behavior, it's difficult to believe that [Mr. Mattson]

20  was not aware to some degree of what [Mr. Jones] was doing and that the way he
    was behaving went beyond the standards of acceptable behavior for someone who

21  works in the DataSphere environment, especially once [Mr. Jones] was moved
    into the Team Captain role.  [Mr. Mattson] had lots of opportunities as team

22  manager moving about the floor to observe [Mr. Jones] in one of his "outbursts".
    Moreover, the witnesses reported enough outbursts by [Mr. Jones] over multiple

ORDER- 6

1   Plaintiffs also testify that Mr. Mattson knew about Mr. Jones' behavior because he

2   witnessed it.  (*See, e.g.*, Graber Dep. at 95-102, 109-10; Pinto Dep. at 46, 84-86.)  Before

3   DataSphere was able to issue a written warning to Mr. Jones, he threatened to "kick the

4   ass" of a male employee, and DataSphere terminated his employment on November 15,

5   2011.  (O'Neil Decl. ¶ 18.)

6        After leaving their roles at DataSphere, Plaintiffs filed discrimination charges

7   against the company with the Equal Employment Opportunity Commission ("EEOC").

8   (*Id.* ¶ 22.)  The EEOC declined to take Plaintiffs' case and issued a right to sue letter.

9   (Compl. ¶ 11.)  Thereafter, on November 13, 2012, Plaintiffs filed this lawsuit.  (*See*

10  *generally* Compl.)  Plaintiffs bring claims for violations of Title VII of the Civil Rights

11  Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and Washington's Law Against

12  Discrimination ("WLAD"), chapter 49.60 RCW, contending that DataSphere subjected

13  them to a hostile work environment, treated them differentially, and retaliated against

14  them because of their sex.  (*Id.* ¶¶ 20-30.)[9]  Plaintiffs claim that they were constructively

15  discharged because of DataSphere's hostile work environment.  (*See id.* ¶ 19.)  Plaintiffs

16  also bring state law tort claims against DataSphere for intentional and negligent infliction

17

18        months even before [Ms. Pinto] joined the team that [Mr. Mattson] must have
          been aware of one or more of these incidents.  If he was entirely unaware of them,
19        then he was failing to provide proper management oversight.

20  (O'Neil Decl. at 8 (emphasis in original).)

21        [9] Plaintiffs also reference a "Section 1981" claim under 42 U.S.C. § 1981 on the first
    page of their complaint, however, Plaintiffs do not mention this claim anywhere else in their
22  pleadings.  (*See* Compl. at 1; *see generally* Resp.)  Plaintiffs conceded at oral argument that they
    do not, in fact, bring any claim under this statute.

ORDER- 7

1  of emotional distress, and negligent hiring, supervision, and training.  (*Id.* ¶¶ 31-38.)  As

2  redress, Plaintiffs seek money damages, injunctive relief, attorney's fees, and punitive

3  damages.  (*Id.* ¶ 1.)

4      DataSphere filed separate motions for summary judgment against each Plaintiff

5  with respect to all of their claims on January 16, 2014.  (*See* Graber Mot.; Pinto Mot.)  In

6  its motions, DataSphere argues that there are no material factual disputes and:  (1)

7  Plaintiffs' hostile work environment and constructive discharge claims fail because they

8  do not meet the requisite harassment standard and because the complained-of conduct

9  cannot be imputed to DataSphere (Graber Mot. at 11-19; Pinto Mot. at 11-20); (2)

10  Plaintiffs have failed to provide evidence establishing prima facie cases of differential

11  treatment or retaliation (Graber Mot. at 19-22; Pinto Mot. at 20-23); and (3) Plaintiffs'

12  state tort claims are duplicative of their harassment claims and must be dismissed (Graber

13  Mot. at 22-23; Pinto Mot. at 23-24).  With respect to Ms. Graber, DataSphere also argues

14  that she does not have standing to bring her claims because she is a debtor in a pending

15  Chapter 13 bankruptcy.  (Graber Mot. at 9-11.)  Plaintiffs filed a consolidated response

16  on February 5, 2014.  (*See* Resp.)  Plaintiffs argue that there are material factual issues

17  about whether the evidence meets the requisite standard for hostile work environment and

18  constructive discharge claims and also whether the evidence establishes a prima facie

19  case of retaliation.  (*Id.* at 7-12, 13-14.)  Plaintiffs do not rebut DataSphere's argument

20  that they do not establish a prima facie case of differential treatment.  (*See generally id.*)

21  Additionally, Plaintiffs argue that there is no legal basis to dismiss their duplicative state

22  tort claims or to dismiss Ms. Graber's claims solely because she is a Chapter 13

1    bankruptcy debtor.  (*Id.* at 12-13, 15-16.)  DataSphere replied on February 11, 2014,

2    asserting again the arguments in its original motions (*see generally* Graber Reply

3    (Dkt. #63); Pinto Reply (Dkt. # 66)), and moving to strike some of the evidence relied

4    upon by Plaintiffs in their response (Graber Reply at 7 n.25; Pinto Reply at 2 n.5).[10]

### III.    ANALYSIS

**A.    Summary Judgment Standards**

7            Summary judgment is appropriate if the evidence, when viewed in the light most

8    favorable to the non-moving party, demonstrates "that there is no genuine dispute as to

9    any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

10   P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*,

11   477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing

12   there is no genuine issue of material fact and that he or she is entitled to prevail as a

13   matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party meets his or her burden, the

14   non-moving party "must make a showing sufficient to establish a genuine dispute of

15   material fact regarding the existence of the essential elements of his case."  *Galen*, 477

16   F.3d at 658.

_____

19   [10] In its reply, DataSphere moves to strike portions of Exhibit D to the Carlson
     Declaration.  (*See* Graber Reply at 7 n.25; Pinto Reply at 2 n.5.)  DataSphere claims that Exhibit
20   D contains e-mails that are irrelevant because they predate Plaintiffs' employment and are not
     sexual in nature.  (*Id.*)  The court has not relied on any e-mails that predate Plaintiffs'
21   employment in coming to its decision, and therefore, does not reach DataSphere's request to
     strike these e-mails.  However, to the extent Exhibit D contains non-sexual e-mails, these e-mails
22   support Plaintiffs' emotional distress claims and are relevant.  Thus, the court DENIES
     DataSphere's motion to strike with respect to any non-sexual e-mails in Exhibit D.

1    The purpose of summary judgment is to pierce the pleadings and to assess the

2    evidence in order to see whether there is a genuine need for trial.  *Matsushita Elec. Indus.*

3    *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In resolving a summary judgment

4    motion, the evidence of the opposing party is to be believed, *Anderson v. Liberty Lobby,*

5    *Inc.*, 477 U.S. 242, 255 (1985), and all reasonable inferences that may be drawn from the

6    facts placed before the court must be drawn in favor of the opposing party, *Matsushita*,

7    475 U.S. at 587.  However, the court may not weigh evidence or make credibility

8    determinations in analyzing a motion for summary judgment because these are "jury

9    functions, not those of a judge."  *Liberty Lobby*, 477 U.S. at 249-50.

10    Both the Ninth Circuit Court of Appeals and Washington courts have set a high

11    standard for granting summary judgment in employment discrimination cases.

12    Washington courts have stated that summary judgment "should rarely be granted in

13    employment discrimination cases."  *See, e.g.*, *Sangster v. Albertson's, Inc.*, 991 P.2d 674,

14    677 (Wash. Ct. App. 2000).[11]  The Ninth Circuit has cautioned that "very little evidence"

15    is needed "to survive summary judgment in a discrimination case, because the ultimate

16    question is one that can only be resolved through a searching inquiry—one that is most

17    appropriately conducted by the fact-finder, upon a full record."  *Schnidrig v. Columbia*

18    *Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996) (internal quotation marks omitted).

19

20    _____

21    [11] However, in order to defeat summary judgment, the employee "must establish specific
      and material facts to support each element of her prima facie case."  *Marquis v. City of Spokane*,

22    922 P.2d 43, 48 (Wash. 1996) (stating that an employee "must do more than express an opinion
      or make conclusory statements").

1    **B.      Effect of Ms. Graber's Chapter 13 Bankruptcy**

2           DataSphere places great emphasis on the effect of Ms. Graber's Chapter 13

3    bankruptcy filing.  Ms. Graber filed for Chapter 13 bankruptcy on August 2, 2013, and

4    her petition is still pending before the bankruptcy court.  (*In re Shari Arlene Graber*,

5    W.D. Wash. Bankr. Case No. 13-17084TWD.)  DataSphere argues that it is entitled to

6    summary judgment on Ms. Graber's claims due to her pending bankruptcy for two

7    reasons:   (1) she failed to properly disclose her employment claims to the bankruptcy

8    trustee; and (2) her claims are property of her bankruptcy estate, and thus, she is not a

9    real party in interest and "lacks standing to pursue her instant claims individually" (i.e., in

10   her own name).  (Graber Mot. at 9-10.)

11          DataSphere's argument is not supported by the facts of this case or the applicable

12   law.  Although debtors, like Ms. Graber, have a duty to file a schedule of assets and

13   liabilities as part of a Chapter 13 bankruptcy and a court may impose judicial estoppel on

14   undisclosed claims, Ms. Graber has disclosed her employment discrimination claims.  *See*

15   11 U.S.C. § 521 (establishing the duty to disclose); *Hamilton v. State Farm Fire & Cas.*

16   *Co.*, 270 F.3d 778, 784 (9th Cir. 2001) ("Judicial estoppel will be imposed when the

17   debtor has knowledge of enough facts to know that a potential cause of action exists

18   during the pendency of the bankruptcy, but fails to amend his schedules or disclosure

19   statements to identify the cause of action as a contingent asset."); *accord Cannata v.*

20   *Wyndham Worldwide Corp.*, 798 F. Supp. 2d 1165, 1172 (D. Nev. 2011).  Ms. Graber

21   disclosed her employment discrimination claims in Schedule B of her bankruptcy filings;

22   she identifies these claims as "EEOC claims."  (Beerman Decl. Ex. C (Dkt. # 42-4)

1    at 21.)  Courts have held that while "[n]umerous cases hold that the debtor has a duty to

2    prepare schedules carefully, completely, and accurately," there are "no bright-line rules

3    for how much itemization and specificity is required [on the forms]."  *In re Mohring*, 142

4    B.R. 389, 394-95 (E.D. Cal. 1992); *see also Cusano v. Klien*, 264 F.3d 936, 946 (9th Cir.

5    2001) (requiring Chapter 11 debtor to "be as particular as is reasonable under the

6    circumstances" when itemizing assets in bankruptcy schedules).  Additionally, when a

7    party acts in good faith and its creditors have been adequately informed, no threat is

8    posed to the "integrity of the bankruptcy system [which] depends on full and honest

9    disclosure of debtors of all their assets."  *Hamilton*, 270 F.3d at 785.  Thus, although Ms.

10   Graber's claims are no longer "EEOC claims" and she does not state all of her

11   employment discrimination claims with specificity, the court concludes that her

12   disclosure is sufficient to avoid judicial estoppel because it gives her creditors and the

13   bankruptcy trustee notice of her claims.

14          The court is also unpersuaded by DataSphere's second argument—that Ms. Graber

15   has no standing to sue in her own name because she is not a party in interest.  (*See* Graber

16   Mot. at 10 ("And, unlike a Chapter 7 debtor, while a Chapter 13 debtor retains authority

17   to sue, that authority is confined to authority to sue or be sued only ***on behalf of the***

18   ***bankruptcy estate***.") (emphasis in original).)  Without ruling on the issue, the Ninth

19   Circuit has cited sister circuits for the rule that debtors in the Chapter 11 and Chapter 13

20   contexts can bring lawsuits in their own names.  *See In re DiSalvo*, 219 F.3d 1035, 1039

21   (9th Cir. 2000) ("In [Chapter 7] liquidation proceedings, *only* the trustee has standing to

22   prosecute or defend a claim belonging to the estate.  The same cannot be said for trustees

1  under the reorganization chapters.  In those regimes, the debtor has express authority to

2  sue and be sued.") (emphasis in original) (citing *Cable v. Ivy Tech State Coll.*, 200 F.3d

3  467, 472 (7th Cir. 1999).)  Additionally, in *Donato v. Metropolitan Life Insurance*

4  *Company*, the District Court for the Northern District of California held that a Chapter 13

5  debtor had standing to pursue a pre-petition employment claim against her former

6  employer. 230 B.R. 418, 425 (N.D. Cal. 1999).  In its holding, the court relied on

7  decisions from the Second and Third Circuits, both of which held that a Chapter 13

8  debtor has standing to pursue pre-petition claims because the debtor retains possession of

9  and may use all property in his or her estate during Chapter 13 liquidation.  *Id.* at 425

10  (citing *Olick v. Parker & Parsley Petroleum Co.*, 145 F.3d 513, 515 (2nd Cir. 1998);

11  *Maritime Elec. Co., Inc. v. United Jersey Bank*, 959 F.2d 1194, 1209 n.2 (3rd Cir. 1991));

12  *see also* 11 U.S.C § 1306(b).  The sound reasoning of these courts is persuasive.

13  Although Ms. Graber has filed for Chapter 13 bankruptcy, she retains possession of all

14  property in her estate including her employment claims against DataSphere, and thus, she

15  has standing to bring these claims.  Accordingly, the court DENIES DataSphere's motion

16  for summary judgment with respect to this issue.

17  **C.    Hostile Work Environment under Title VII and WLAD**

18          Plaintiffs claim they were subjected to a hostile work environment while they were

19  employed at DataSphere.  Claims for gender discrimination based on a hostile work

20  environment are recognized under both Title VII and WLAD.  *See, e.g.*, *Nichols v. Azteca*

21  *Rest. Enter., Inc.*, 256 F.3d 864, 875 (9th Cir. 2001).  DataSphere asserts that it is entitled

22  to summary judgment on Plaintiffs' hostile work environment claims because, even if

1    Plaintiffs' allegations are true, they do not "rise to the level required to prove an abusive

2    working environment when compared to the types of behavior found to be sufficiently

3    severe under the law." (Graber Mot. at 12; Pinto Mot. at 12.)  The court concludes,

4    however, that there is a material factual issue as to whether Plaintiffs' evidence shows

5    that DataSphere's work environment was sufficiently severe and abusive to support their

6    hostile work environment claims.

7         Hostile work environment claims are based on the existence of an abusive work

8    environment.  A hostile work environment exists when the harassment is "sufficiently

9    severe or pervasive to alter the conditions of the victim's employment and create an

10   abusive work environment." *Nichols*, 256 F.3d at 872.  This standard is both objective

11   and subjective.  *Dawson*, 630 F.3d at 939.  Plaintiffs must show that a "reasonable

12   person" would find the work environment "hostile or abusive" and that each Plaintiff in

13   fact found it so.  *Westendorf  v. W. Coast Contractors of Nev., Inc.*, 712 F.3d 417, 421

14   (9th Cir. 2013) (citing *Faragher*, 524 U.S. at 787).  "To determine if an environment is

15   sufficiently hostile or abusive . . . [courts] look at 'all the circumstances,' including the

16   'frequency of the discriminatory conduct; its severity; whether it is physically threatening

17   or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with

18   an employee's work performance.'" *Nichols*, 256 F.3d at 872 (citing *Harris v. Forklift*

19   *Sys., Inc.*, 510 U.S. 17, 23 (1993)).  "The required level of severity or seriousness varies

20   inversely with the pervasiveness or frequency of the conduct." *Id.* (citing *Ellison v.*

21   *Brady*, 924 F.2d 872, 878 (9th Cir. 1991)).  Courts must keep in mind, however, that

22   "Title VII is not a general civility code" and that "evidence showing sporadic use of

1   abusive language, gender-related jokes, and occasional teasing" do not establish

2   violations.  *E.E.O.C. v. Prospect Airport Serv. Inc.*, 621 F.3d 991, 998 (9th Cir. 2010).

3      Hostile work environment claims are similar under Washington and Federal law.

4   Federal cases interpreting Title VII are persuasive authority for the construction of

5   WLAD because the state civil rights statute substantially parallels Title VII.  *Estevez v.*

6   *Faculty Club of Univ. of Wash.*, 120 P.3d 579, 588 (Wash. Ct. App. 2005).  Accordingly,

7   analysis of federal law applies with equal force to the WLAD claim.  *Hardage v. CBS*

8   *Broadcasting Inc.*, 427 F.3d 1177, 1183 (9th Cir. 2005); *accord Laying v. Twin Harbors*

9   *Grp. Home Ass'n*, No. 05-5260, 2006 WL 197127, at *2 (W.D. Wash. Jan. 24, 2006).

10      DataSphere argues that neither Ms. Graber's nor Ms. Pinto's testimony involves

11   conduct that is sufficiently severe or pervasive to meet the hostile work environment

12   standard.  (*See* Graber Mot. at 12; Pinto Mot. at 12.)  DataSphere characterizes Ms.

13   Graber's testimony as only involving "several negative encounters with Jones."  (Graber

14   Mot. at 13.)  Likewise, DataSphere claims that Ms. Pinto's testimony does not show

15   sufficiently severe conduct even though it recognizes her allegations that she experienced

16   "'constant' unwelcome conduct during her brief five weeks of work at DataSphere

17   through e-mails she received; profanity such as being called or referred to as a 'bitch' or

18   'cunt'; and being threatened by Antonio Jones."  (Pinto Mot. at 12.)  Finally, DataSphere

19   also argues that Plaintiffs' allegations regarding offensive e-mails "fail to qualify as

20   severe or pervasive conduct."  (Graber Mot. at 13; Pinto Mot. at 12-13.)

21      DataSphere analogizes to the facts of three cases to support its argument that the

22   complained-of conduct is not sufficiently severe.   In *Brooks v. City of San Mateo*, the

1  court decided that there was no hostile work environment where the alleged harasser

2  forced his hand down the plaintiff's sweater and fondled her breasts one time.  229 F.3d

3  917, 921-24 (9th Cir. 2000).  Similarly, in *Kortan v. California Youth Authority*, the court

4  held that there was no hostile work environment when a supervisor called female

5  employees derogatory terms in front of the plaintiff on several occasions and called her

6  "Medea."  217 F.3d 1104, 1109 (9th Cir. 2000).  Finally, in *MacDonald v. Korum Ford*,

7  the court affirmed that there was no sufficient factual basis for a hostile environment

8  claim when a co-worker kissed the plaintiff one time at a New Year's party, a second co-

9  worker had a habit of placing his hand on the plaintiff's back and brushing past her in the

10  hallway, and a third co-worker used inappropriate language or gestures in the plaintiff's

11  presence twice.  912 P.2d 1052, 1058 (Wash. Ct. App. 1996).  In so holding, the

12  *MacDonald* court relied on the plaintiff's testimony that she did not perceive the second

13  co-worker's actions as "sexual harassment at the time they occurred" and that she was

14  unsure whether the third co-worker meant his inappropriate statements to have sexual

15  overtones.  *Id.* at 1058-59.  Additionally, DataSphere cites out-of-circuit, unpublished

16  cases in footnotes for the proposition that "unsavory mass e-mails" that are

17  "inappropriate and unprofessional" do not create a hostile work environment.  (*See, e.g.*,

18  Graber Mot. at 13 n.87 (citing *Reed v. Metro. Gov't of Nashville & Davidson Cnty.*, 286

19  Fed. App'x 251, 253-54 (6th Cir. 2008)).)

20        None of these cases control the outcome of this case.  Here, Plaintiffs do not

21  provide evidence of a single instance of abusive conduct, or even "several" instances of

22  abusive conduct.  Instead, Plaintiffs provide evidence that they were constantly harassed.

1   Plaintiffs testify that they were regularly called derogatory names like "bitch" and "cunt"

2   by a supervisor and a co-worker, and that they were each threatened by the same co-

3   worker. (*See* Graber Dep at 95, 118; *see generally* Pinto Dep. at 48-68.) Ms. Graber

4   testified that Mr. Jones threatened her on at least two occasions. (Graber Dep. at 109.)

5   On one of these occasions, Mr. Jones threatened Ms. Graber after she talked to

6   DataSphere's human resources personnel by "pointing at [her], calling [her] a bitch,

7   calling [her] a snitch," and saying: "I'm untouchable. I'm not going anywhere. I'm

8   getting my own team." (*Id.*) Ms. Graber testifies that on another occasion Mr. Jones

9   called her a bitch and suggested that "he would love to get in the elevator and go

10  downstairs" and get into a physical altercation with her. (Graber Dep. at 96.) Similarly,

11  Ms. Pinto testified that Mr. Jones threatened her on more than one occasion by hitting the

12  wall in her cubicle, calling her a "fucking bitch" and telling her that she was either

13  "fucking worthless" or that she would be kicked off the sales team. (Pinto Dep. at 50-51,

14  87-91.) Ms. Pinto testified that Mr. Jones called her derogatory names "almost daily."

15  (*Id.* at 67.) Plaintiffs also provide evidence that they were sent numerous sexist e-mails

16  by co-workers and managers. (*See* Carlson Decl. Ex. D.) Considering all of the

17  circumstances, reasonable minds could differ as to whether this conduct is sufficiently

18  severe to constitute a violation of Title VII and WLAD. *See E.E.O.C. v. Nat'l Educ.*

19  *Ass'n of Alaska*, 422 F.3d 840, 847 (9th Cir. 2005) ("Where the conduct in question was

20  allegedly a "daily thing," there can be little question that a reasonable juror might infer

21  that [the harasser's] pattern of verbal and physical intimidation . . . was sufficiently

22  severe to satisfy the statute.") Plaintiffs' evidence should be weighed by the jury, not by

1    the court.  Accordingly, the court DENIES DataSphere's motions for summary judgment

2    with respect to this issue.

3        1.  Vicarious Liability under Title VII and WLAD and the *Ellerth / Faragher*
            Affirmative Defense

4

5    Next, DataSphere argues that it is not vicariously liable for the conduct of its

     supervisory employees, like Mr. Mattson, even if there was a hostile work environment.[12]

6    (Graber Mot. at 16; Pinto Mot. at 16.)  In order to establish a hostile work environment

7    claim based on sex discrimination, Plaintiffs must show not only that the workplace was

8    permeated with discriminatory conduct sufficiently severe or pervasive as to alter the

9    condition of their employment but also that DataSphere is liable for the hostile

10   environment.  *See Faragher v. Boca Raton*, 524 U.S. 775, 776, 807 (1998).  Generally,

11   employers are vicariously liable for the actions of supervisors.  *See id.* at 807 ("An

12   employer is subject to vicarious liability to a victimized employee on an actionable

13   hostile environment created by a supervisor with immediate . . . authority over the

14   employee.").  A supervisor is someone the employer has empowered to take "tangible

15   employment actions against the victim, i.e., to effect a 'significant change in employment

16   status, such as hiring, firing, failing to promote, reassignment with significantly different

17   responsibilities.'"  *Vance v. Ball State*, --- U.S. ----, 133 S. Ct. 2434, 2443 (2013)

18   (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

19   _____

20   [12] In its motion, DataSphere also seems to imply that it is not vicariously liable for the
     conduct of any employee, including the conduct Mr. Jones, who was a non-supervisory

21   employee. (*See* Graber Mot. at 14-16; Pinto Mot. at 14-16.)  However, DataSphere's potential
     liability for Mr. Jones' conduct is not based on vicarious liability, but its own negligence in
     preventing or correcting Mr. Jones' conduct.  Thus, DataSphere may also be separately liable for

22   its own negligence with regard to Mr. Jones, as discussed in Section C.2. *infra*.

1    An employer, however, may raise an affirmative defense to avoid vicarious

2    liability.  *Dawson*, 630 F.3d at 940.  The affirmative defense (known as the "*Faragher /*

3    *Ellerth*" defense) has two prongs:  (1) "that the employer exercised reasonable care to

4    prevent and correct promptly any sexually harassing behavior" and (2) "that the plaintiff

5    unreasonably failed to take advantage of any preventative or corrective opportunities

6    provided by the employer or to avoid harm otherwise."  *Ellerth*, 524 U.S. at 765.

7    "Whether the employer has a stated anti-harassment policy is relevant to the first element

8    of the defense."  *Nichols*, 256 F.3d at 877 (citing *Ellerth*, 524 U.S. at 765).  Furthermore,

9    "an employee's failure to use a complaint procedure provided by the employer will

10   normally suffice to satisfy the employer's burden under the second element of the

11   defense."  *Id.*  The *Faragher / Ellerth* defense is applicable only to vicarious liability

12   claims stemming from a supervisor's harassment.  *See McGinest v. GTC Serv. Corp.*, 360

13   F.3d 1103, 1119 (9th Cir. 2004).  The defense is not applicable to claims based on a co-

14   worker's harassment.  *Id.*

15   DataSphere argues that it satisfies the elements of the *Faragher / Ellerth*

16   affirmative defense, and therefore, that it is not vicariously liable for any hostile work

17   environment.  DataSphere argues that its satisfies the *Faragher / Ellerth* affirmative

18   defense because (1) "DataSphere exercised reasonable care to prevent workplace

19   harassment through its anti-harassment policy, distributed to all employees" (Graber Mot.

20   at 15; Pinto Mot. at 15), (2) "DataSphere took prompt remedial action and effectively

21   ended the alleged offending conduct" (Pinto Mot. at 15), and (3) Ms. Graber "never

22   complained about any conduct to anyone at DataSphere" (Graber Mot. at 15).

1        DataSphere has provided undisputed evidence that it is entitled to summary

2   judgment on its affirmative defense to vicarious liability for the acts of Mr. Mattson.

3   DataSphere satisfies the first prong of the defense, in part, because it has a workplace

4   anti-harassment policy that it has distributed to all employees.  (O'Neil Decl. Ex. A at 2.)

5   This policy was given to both Plaintiffs.  (O'Neil Decl. Ex. B at 4-5.)  DataSphere's

6   policy defines sexual harassment, sets forth a reporting procedure, states that employees

7   who violate the policy will be disciplined, and assures employees that no reprisals will be

8   made against them for complaining of sexual harassment.  (*Id.*)  The Ninth Circuit has

9   found that policies with these attributes support the first prong of the affirmative defense.

10  *See, e.g.*, *Nichols*, 256 F.3d at 877; *Kohler v. Inter-Tel Techs.*, 244 F.3d 1167, 1180 (9th

11  Cir. 2001); *Montero v. Agco Corp.*, 192 F.3d 856, 862 (9th Cir. 1999).  In addition, once

12  Mr. Mattson's abusive conduct in using the word "bitch" and sending inappropriate e-

13  mails came to DataSphere's attention,[13] DataSphere promptly investigated the allegations

14  and took remedial action by giving Mr. Mattson verbal and written warnings.  (O'Neil

15  Decl. ¶ 20; O'Neil Decl. Ex. H at 9.)  Where, as here, an employer has a workplace anti-

16  harassment policy, promptly investigates alleged harassment, and takes remedial action,

17  the first prong is satisfied.  *Montero*, 192 F.3d at 862-63; *accord Kohler*, 244 F.3d at

18  1181.

19

20  ――――――――――――

21      [13] Mr. Mattson's objectionable conduct came to the attention of DataSphere's human resources team only as a consequence of its investigation of Mr. Jones' conduct.  (*See* O'Neil

22  Decl. ¶ 20.)  There is no evidence in the record that either Plaintiff ever made a formal complaint about Mr. Mattson's conduct.  (*See generally* Dkt.)

1    DataSphere has also satisfied the second prong of the *Faragher / Ellerth* defense.

2    This is because neither Plaintiff utilized DataSphere's complaint procedure to protest Mr.

3    Mattson's conduct.  (*See* Graber Dep. at 106-09, 126; Pinto Dep. at 91-93.)  Plaintiffs

4    argue that they did not need to complain about Mr. Mattson's conduct because he was a

5    manager and DataSphere's employment manual requires employees to complain to

6    managers.  However, Plaintiffs' argument does not create a factual dispute as to this

7    issue—the law requires employees to take affirmative steps and utilize a company's

8    complaint procedures when supervisor misconduct is alleged.  *See, e.g.*, *Kohler*, 244 F.3d

9    at 1182.  Thus, DataSphere is entitled to summary judgment in its favor on the issue of its

10   vicarious liability for Mr. Mattson's conduct because it has provided undisputed evidence

11   sufficient to establish its affirmative defense as a matter of law.   *See Holly D. v. Cal.*

12   *Inst. of Tech.*, 339 F.3d 1158, 1177 (9th Cir. 2003) (affirming summary judgment on

13   employer's *Faragher / Ellerth* affirmative defense).  Accordingly, the court GRANTS

14   DataSphere's motions for summary judgment on the issue of its vicarious liability for Mr.

15   Mattson's conduct.

16       2.  Negligence under Title VII and WLAD

17    Even if it is not vicariously liable, DataSphere may still be liable in connection

18   with Mr. Jones' conduct.  Although DataSphere seems to argue in its motions that its

19   *Faragher / Ellerth* affirmative defense forecloses all liability (*see* Graber Mot. at 14-16;

20   Pinto Mot. at 14-16), it can still be liable for the harassment of a co-worker if it was

21   negligent in failing to end the harassment.  The question of whether DataSphere was

22

1    negligent in failing to end the harassment of Mr. Jones, Plaintiffs' co-worker, is

2    appropriate for a jury to decide.

3        In this context, DataSphere would be held liable if it acted negligently.  The rule is

4    that, "where harassment by a co-worker is alleged, the employer can be held liable only

5    where its own negligence is the cause of the harassment." *Swenson v. Potter*, 271 F.3d

6    1184, 1191 (9th Cir. 2001).  Generally, the employer may be liable if it knows or should

7    know of the harassment but fails to take steps "'reasonably calculated' to end the

8    harassment." *Dawson*, 630 F.3d at 938.  "The reasonableness of the remedy depends on

9    [the employer's] ability to:  (1) 'stop harassment by the person who engaged in

10   harassment;' and (2) 'persuade potential harassers to refrain from unlawful conduct.'"

11   *Nichols*, 256 F.3d at 875 (quoting *Ellison*, 924 F.2d at 882).  Although "the most

12   significant immediate measure an employer can take . . . is to launch a prompt

13   investigation . . . the 'fact of investigation alone' is not enough." *Swenson*, 271 F.3d at

14   1193 (citing *Fuller v. City of Oakland*, 47 F.3d 1522, 1529 (9th Cir. 1995)).

15       Factual disputes prevent summary judgment on this issue.  Specifically, there is a

16   material factual issue as to whether DataSphere should have known about Mr. Jones'

17   offending conduct and whether DataSphere was negligent for not having taken remedial

18   action sooner.  DataSphere contends that "it is undisputed that, once Pinto reported

19   Jones' alleged harassment on October 11, 2011, [it] took prompt remedial action and

20   effectively ended the alleged offending conduct." (Graber Mot. at 15; Pinto Mot. at 15.)

21   However, both Plaintiffs testify that Mr. Mattson, their supervisor and a manager in the

22   company, witnessed Mr. Jones conduct toward them and took no action.  (*See* Resp. at 3-

ORDER- 22

1    4; Pinto Mot. at 12.)  Thus, it is disputed whether Mr. Jones' conduct in front of Mr.

2    Mattson constituted notice to DataSphere of the harassing behavior, and whether

3    DataSphere is negligent for taking no action when Mr. Mattson witnessed such conduct.

4    (*See* Resp. at 12.)

5          DataSphere's argument to the contrary is unavailing.  DataSphere states that

6    "Graber's admitted recommendation of Jones for the Team Captain role coupled with her

7    admitted failure to ever complain while employed with DataSphere gave Mattson

8    objective reasons to believe that Graber did not regard herself as the victim of a sexually

9    hostile working environment."  (Graber Reply at 8; Pinto Reply at 8.)  Ms. Graber's

10   recommendation and failure to complain that she was being sexually harassed does not

11   mean that DataSphere was not on notice of Mr. Jones' improper behavior toward either

12   Ms. Graber or Ms. Pinto, especially when Mr. Mattson witnessed Mr. Jones'

13   inappropriate conduct.  Additionally, Ms. Pinto testifies that Mr. Jones' inappropriate

14   conduct toward her continued even after Mr. Hartnett talked to him about his September

15   30, 2011, verbal outburst.   In relation to the incident, she states "[Mr. Jones] came out

16   [after meeting with Mr. Hartnett] and said 'I'm untouchable'. . . [a]nd paraded around

17   and made a big deal of how he could do whatever he wanted."  (Pinto Dep. at 51-52.)

18   Afterward, Mr. Jones continued to call Ms. Pinto a "fucking bitch."  (*See* Pinto Dep. at

19   56.)  The question of DataSphere's negligence in addressing and ending Mr. Jones'

20   hostile behavior are appropriate issues for a jury to decide.  Accordingly, the court

21   DENIES DataSphere's motions to the extent that it seeks summary judgment on the issue

22   of its own negligence with respect to Mr. Jones' conduct.

1    **D.    Constructive Discharge under Title VII and WLAD**

2         DataSphere may also be liable for constructive discharge.  The federal and

3    Washington standards for constructive discharge are similar.  In Washington, "while

4    resignations are presumed to be voluntary, a plaintiff may overcome that presumption . . .

5    by demonstrating a deliberate act by the employer that made her working conditions so

6    intolerable that a reasonable person would have felt compelled to resign."  *Washington v.*

7    *Boeing*, 19 P.3d 1041, 1049 (Wash. Ct. App. 2000).  Likewise, the federal standard

8    requires a plaintiff to "show that the abusive working environment became so intolerable

9    that [its] resignation qualified as a fitting response."  *Penn. State Police v. Suders*, 542

10   U.S. 129, 133 (2004).  This is an objective standard.  *Id.* at 146-47.  Furthermore, "[a]

11   plaintiff alleging constructive discharge must show some aggravating factors, such as a

12   continuous pattern of discriminatory treatment."  *Schindrig*, 80 F.3d at 1412 (citing

13   *Sanchez v. City of Santa Ana*, 915 F.2d 424, 431 (9th Cir. 1990)).  The Ninth Circuit has

14   "upheld factual findings of constructive discharge when the plaintiff was subjected to

15   incidents of differential treatment over a period of months or years.  *Watson v.*

16   *Nationwide Ins., Co.*, 823 F.2d 360, 361 (9th Cir. 1987).  However, the *Faragher /*

17   *Ellerth* affirmative defense is also available to employers where the constructive

18   discharge is based on supervisor harassment.  *Suders*, 542 U.S. at 134.  Constructive

19   discharge claims usually present a question of fact appropriate for the jury to decide.  *Id.*

20   at 362.

21        Plaintiffs provide sufficient evidence to create a material factual issue of whether

22   constructive discharge occurred.  In arguing for summary judgment on this issue,

ORDER- 24

1   DataSphere emphasizes that Plaintiffs resigned voluntarily, and that constructive

2   discharge claims are not available where a plaintiff has failed to prove that a hostile work

3   environment existed.  (*See* Graber Mot. at 16-19; Pinto Mot. at 16-19); *see also Brooks*,

4   229 F.3d at 930-31 ("Where a plaintiff fails to demonstrate the severe or pervasive

5   harassment necessary to support a hostile work environment claim, it will be impossible

6   for her to meet the higher standard for constructive discharge . . . .").  These arguments

7   are unpersuasive because Plaintiffs provide sufficient evidence to overcome the

8   presumption of voluntary resignation, and because they provide evidence showing, at

9   minimum, a material factual dispute about the existence of a hostile work environment,

10  as already discussed.  Plaintiffs both claim they were subjected to harassing, threatening,

11  and discriminatory conduct by their co-worker, Mr. Jones, over a period of months and

12  that DataSphere did nothing to remedy this harassment.[14]  Additionally, both Ms. Graber

13  and Ms. Pinto testify that they had serious incidents with Mr. Jones that closely preceded

14  their resignation; these incidents suggest a causal link between Mr. Jones' conduct and

15  their decision to leave DataSphere.  (Pinto Dep. at 81-91; Graber Dep. at 100-101.)  The

16  length of time between incidents of harassment is relevant to whether there is a causal

17  link.  *See, e.g.*, *Wood v. GCC Bend, LLC*, 270 Fed. App'x 484, 485 (9th Cir. 2008) (five-

18  _____

19  [14] The case law implies that plaintiffs can allege a claim for constructive discharge solely
    on the basis of a co-worker's conduct if it rises to the requisite level of intolerableness.  *See*

20  *Suders*, 542 U.S. at 148 (stating "harassment so intolerable as to cause a resignation may be
    effected through co-worker conduct, unofficial supervisory conduct, or official company acts").

21  However, Plaintiffs cannot rely on evidence of Mr. Mattson's or any other manager's direct
    harassment in proving their constructive discharge claims because any liability for this conduct is

22  foreclosed by the *Faragher / Ellerth* test, as already discussed.

1  month lapse between "workplace embarrassment" and resignation could not support a

2  finding of causation between the two events).  Mr. Jones' ongoing harassment creates a

3  material factual issue of whether Plaintiffs were constructively discharged.  A reasonable

4  jury could conclude that Mr. Jones' behavior and DataSphere's failure to control this

5  behavior created an environment in which a reasonable person would feel compelled to

6  resign.  Accordingly, the court DENIES DataSphere's motions for summary judgment

7  with respect to this claim.

8  **E.     Differential Treatment and Retaliation under Title VII and WLAD**

9          DataSphere is entitled to summary judgment on Plaintiffs' differential treatment

10  and retaliation sex discrimination claims.  Summary judgment is appropriate because

11  Plaintiffs have failed to provide evidence establishing a prima facie case for either of

12  these claims.  To prevail on their retaliation claims, Plaintiffs must show:  (1) that they

13  engaged in a protected activity; (2) that they suffered an adverse employment action; and

14  (3) that there was a causal connection between the protected activity and the adverse

15  employment action.  *Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 965 (9th Cir.

16  2004).  The showings required for a retaliation claim under both Title VII and the WLAD

17  are identical, except for the causation element.  *Ellorin v. Applied Fishing, Inc.*, No. C12-

18  1923JLR, 2014 WL 498969, at *9 (W.D. Wash. Feb. 7, 2014) (stating that Title VII

19  requires "but-for" causation, while WLAD only requires that discrimination be a

20  "substantial factor" in causing the retaliatory conduct).

21          Additionally, differential treatment claims under Title VII or WLAD are

22  considered under the burden shifting analysis established by the Supreme Court.  *See*

1   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).  Under the *McDonnell*

2   *Douglas* framework, the plaintiff must first establish a prima facie case of discrimination.

3   *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000).  Plaintiffs can

4   establish a prima facie case by showing:  (1) that they belong to a protected class; (2) that

5   they were qualified for the position; (3) that they were subjected to an adverse

6   employment action; and (4) that similarly situated employees outside the protected class

7   were treated more favorably.  *Id.*; *Domingo v. Boeing Employees' Credit Union*, 98 P.3d

8   1222, 1225 (Wash. Ct. App. 2004).  Next, the burden of production shifts to the

9   defendant to articulate a legitimate nondiscriminatory reason for its decision.  *Wallis v.*

10  *J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994).  Finally, the burden shifts back to the

11  plaintiff to demonstrate that the reason offered by the defendant is pretext for an

12  underlying discriminatory motive.  *Chuang*, 225 F.3d at 1123.

13         Plaintiffs do not show facts establishing their differential treatment and retaliation

14  claims.  Specifically, Plaintiffs provide no evidence showing that either experienced an

15  "adverse employment action," a necessary element of the prima facie case for both

16  claims.  (*See* Graber Mot. at 19-22; Pinto Mot. at 21-23.)  Adverse employment actions

17  are significant changes in employment status and include, "hiring, firing, failing to

18  promote, reassignment with significantly different responsibilities, or a decision causing a

19  significant change in benefits."  *Ellerth*, 524 U.S. at 761.  "A tangible employment action

20  in most cases inflicts direct economic harm."  *Id.* at 762.  It is an action that "materially

21  affects the compensation, terms, conditions, or privileges of employment."  *Campbell v.*

22  *Knife River Corp.—Nw.*, 783 F. Supp. 2d 1137, 1149 (D. Or. Mar. 8, 2011) (citing *Davis*

1   *v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008); *cf. Kortan*, 217 F.3d at 1113 (no

2   adverse employment action where the plaintiff "was not demoted, was not stripped of

3   work responsibilities, was not handed different or more burdensome work

4   responsibilities, was not fired or suspended, was not denied any raises, and was not

5   reduced in salary or any other benefit").  Additionally, constructive discharge is not an

6   adverse employment action.  *See Suders*, 542 U.S. at 149.

7        Plaintiffs do not provide any evidence that they had an adverse employment action

8   taken against them.  They provide no evidence that they were fired, not promoted,

9   reassigned with different responsibilities, or had their benefits decreased.  (*See* Graber

10  Dep.; Pinto Dep.)  The closest thing to an adverse employment action Ms. Pinto testifies

11  to is that she was assigned to a different sales team.  (Pinto Dep. at 97-100.)  However,

12  "not every transfer adversely affects [a] victim's employment."  *Swenson*, 271 F.3d at

13  1194.  "If [the employer] decides to separate the two employees in the workplace, the

14  employer may properly consider the relative ease of moving them and their respective

15  importance to its business operations . . . [it] has wide discretion in choosing how to

16  minimize contact between the two employees, so long as the accuser is not moved to an

17  objectively less desirable position."  *Id*.  Here, Ms. Pinto was moved to a different team

18  on a different floor of DataSphere's offices, she was given the same role and benefits on

19  her new team, and DataSphere provided evidence that this move was intended to prevent

20  Mr. Jones from bothering her.  (*See* O'Neil Decl. ¶ 11 ("To prevent further negative

21  interactions between Mr. Jones and Ms. [Pinto] we moved [her] to a different team where

22  Mr. Jones could not bother her.").)  Even if DataSphere's conduct toward Ms. Pinto did

1   rise to the level of an adverse employment action—which it does not—DataSphere

2   presents a legitimate, non-discriminatory reason for the move.  (*See id.*)  Ms. Pinto

3   provides no evidence that DataSphere's proffered reason is pretext for a discriminatory

4   motive.  (*See* Dkt.)  Furthermore, Ms. Graber does not allege that DataSphere took any

5   adverse employment action against her; she only testifies that she was "disciplined" by

6   Mr. Jones yelling and threatening her.  (Graber Dep. at 95-96.)  Neither Plaintiff was

7   fired.  (Pinto Dep. 140-42; Graber Dep. 151-52.)  Plaintiffs have failed to show any

8   adverse employment actions, and therefore, they do not establish prima facie cases of

9   differential treatment and retaliation.  Accordingly, the court GRANTS DataSphere's

10  motions for summary judgment on these claims.

11  **F.      State Law Tort Claims Duplicative of Title VII and WLAD Claims**

12          Last, DataSphere argues that Plaintiffs' state law tort claims are duplicative of

13  their WLAD claims and must be dismissed under Washington law.  (*See* Graber Mot. at

14  22-23; Pinto Mot. at 23-24.)  Washington courts have held that common law tort claims,

15  such as negligent and intentional infliction of emotional distress, and negligent

16  supervision or retention, are duplicative and must be dismissed when they are based on

17  the same facts as a discrimination claim.  *See Francom v. Costco Wholesale Corp.*, 991

18  P.2d 1182, 1192-93 (Wash. Ct. App. 2000) (ruling that an employee may recover

19  damages for emotional distress in an employment context but only if the factual basis for

20  the claim is distinct from the factual basis for the discrimination claim); *see also Ellorin*,

21  2014 WL 498969, at *18 (W.D. Wash.) (granting summary judgment and dismissing

22  plaintiff's negligent and intentional infliction of emotional distress claims, negligent

1    hiring and supervision claims, and sexual battery claim as duplicative of state-law

2    employment discrimination claim).  Separate WLAD claims and state tort claims can

3    only arise "when the claim is based on a separate factual basis from the sexual

4    discrimination claim." *Haury v. Snow*, 31 P.3d 1186, 1193 (Wash. Ct. App. 2001).  At

5    oral argument, Plaintiffs conceded that many of their tort claims and their WLAD claims

6    are based on overlapping facts, but Plaintiffs also argued that there were some e-mails

7    that, if not sexist in nature, were disturbing and supported their emotional distress claims.

8    The court is satisfied that Plaintiffs' emotional distress claims are based on these non-

9    sexist e-mails, and thus, these claims are supported by different facts than Plaintiffs'

10   WLAD claims.  As to Plaintiffs' other claims, however, there is no dispute that Plaintiffs

11   rely on the same facts to support their WLAD discrimination claims and state law tort

12   claims for negligent hiring, supervision, and training.  Thus, these claims are duplicative

13   of Plaintiffs' discrimination claims.  (Compl. ¶¶ 31-38.)  Accordingly, the court

14   GRANTS DataSphere's motions for summary judgment as to Plaintiffs' negligent hiring,

15   supervision, and training claims.

16                          **IV.    CONCLUSION**

17          For the reasons discussed, the court GRANTS in part and DENIES in part

18   DataSphere's motions for summary judgment against Ms. Graber (Dkt. # 37) and Ms.

19   Pinto (Dkt. # 39).  The court GRANTS DataSphere's motions for summary judgment

20   with respect to:  (1) Plaintiffs' hostile work environment claims based on DataSphere's

21   vicarious liability for Mr. Mattson's conduct; (2) Plaintiffs' differential treatment and

22   retaliation claims; and (3) Plaintiffs' state tort claims for negligent hiring, supervision,

ORDER- 30

1   and training.  However, the court DENIES DataSphere's motions for summary judgment

2   on Plaintiffs' other claims.  Specifically the court DENIES DataSphere's motions for

3   summary judgment with respect to:  (1) Plaintiffs' hostile work environment claims based

4   on DataSphere's negligence concerning Mr. Jones' conduct; (3) Plaintiffs' constructive

5   discharge claims; and (4) Plaintiffs' state tort claims for emotional distress.

6          Dated this 27th day of February, 2014.

7

8

9          _____

10         JAMES L. ROBART
           United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 31